# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CELINA M. ALLEN, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 13-781L |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

This matter is before the Court on the Motion of Plaintiff Celina M. Allen for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits ("DIB") under 42 U.S.C. § 405(g). Claiming a brain condition, idiopathic intracranial hypertension ("IIH"),[1] that no qualified medical provider has diagnosed and a stroke that no medical testing has confirmed, and relying on opinion evidence that assumed these are her primary impairments, Plaintiff contends that the Administrative Law Judge ("ALJ") failed properly to consider the opinions of her physician's assistant and of a psychologist who performed a one-time examination, relying instead on outdated opinions of a non-examining state agency physician and psychologist. She also claims that the ALJ erred in discounting her credibility and that of her mother. Because of these errors, she contends that his determination of her residual functional capacity ("RFC")[2] is not supported by substantial

---

[1] Plaintiff attached extensive material to her motion for reversal describing IIH, also known as "pseudotumor cerebri" or "PTC;" it is a disorder of elevated spinal fluid pressure in the brain. It causes headaches, possible visual blurring and, without treatment, can lead to blindness. ECF Nos. 8-2 to 8-5.

[2] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

evidence.  Defendant Carolyn W. Colvin ("Defendant") has filed a Motion for an order affirming the Commissioner's decision.

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the record, I find no legal error and that the ALJ's findings are well supported by substantial evidence.  Accordingly, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 8) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 12) be GRANTED.

## I.  **Background Facts**

Plaintiff is an obese woman who was thirty-three years old at the onset of her alleged disability on June 30, 2010.  Tr. 42, 153.  Married and living with her husband and parents, she completed a year and a half of college and had worked as a certified nurse's aide and customer service representative until June 30, 2010, when paresthesia[3] that had begun in her right hand and progressed to the right arm and eventually the whole right side of her body brought her to the emergency department of Rhode Island Hospital.  Tr. 41, 201, 250-55.  She now alleges that she has been disabled since June 30, 2010, due to IIH, headaches, balance problems, concentration and memory problems, asthma, high blood pressure and stroke.  Tr. 200.  The ALJ included obesity as an additional impairment.  Tr. 18.  Other relevant impairments include migraines, mood disorder, generalized anxiety disorder and cognitive disorder.  Id.

---

[3] Paresthesia is a sensation of tingling, tickling, pricking or burning of the skin with apparently no long-term physical effect.  The most familiar form of paresthesia is the sensation known as "pins and needles" or of a limb "falling asleep."  Sedens v. Metro. Life Ins. Co., No. CIV.A. 10-12127-DJC, 2012 WL 748373, at *5 (D. Mass. Mar. 8, 2012); Cochrane v. Astrue, No. 08 C 2906, 2009 WL 5173496, at *5 n.4 (N.D. Ill. Dec. 30, 2009).

## A. Medical History

Plaintiff's June 30, 2010, trip to the emergency department of Rhode Island Hospital for paresthesia resulted in a CT scan of her brain that revealed no evidence of any acute intracranial pathology. Tr. 255. The treating notes indicate that the attending physician concluded that her symptoms likely were caused by anxiety or an atypical migraine and were not "TIA/CVA."[4] Tr. 251-52. Nevertheless, the next day, when she followed up with her primary medical provider, John Kochanski, a physician's assistant[5] at Anchor Medical Center, she told him that it might have been "a TIA and possibly an anxiety attack." Tr. 258. Based on her report, Mr. Kochanski assessed unspecific transient cerebral ischemia. Tr. 259. At his recommendation, Plaintiff visited a neurologist at Rhode Island Hospital, Dr. Deena Kuruvilla, on July 27, 2010, to rule out TIA. Tr. 267-68. Following an essentially normal examination (including normal memory, strength, coordination and gait), Dr. Kuruvilla wrote that she was considering "anxiety disorder versus TIA;" in light of the prior negative CT scan, she referred Plaintiff for a brain MRI and a carotid doppler scan and advised her to return as soon as the testing was complete. Tr. 268. Plaintiff apparently did not follow-up with the recommended tests.[6] Except for a "dull headache" mentioned to Mr. Kochanski, she did not report headaches at all during any of these

---

[4] "TIA" refers to "transient ischemic attack", while "CVA" means "cerebrovascular accident." ECF No. 12 at 4. In the vernacular, TIA is referred to as a "mini stroke." Feldman v. Law Enforcement Assocs. Corp., 955 F. Supp. 2d 528, 538 (E.D.N.C. 2013). CVA refers to a regular stroke. See Sanchez v. United States, 133 F. App'x 747, 748 (1st Cir. 2005).

[5] As a physician's assistant, Mr. Kochanski is an "other source" under the applicable regulations and cannot establish medically determinable impairments. See 20 C.F.R. § 404.1502 (defining treating source); 20 C.F.R. § 404.1513(a) (defining acceptable medical source). He worked with Plaintiff's primary care physician, Dr. Robert Ellison, though the record does not reflect that Plaintiff was ever seen by Dr. Ellison. Rather, all of her appointments seem to have been either with Mr. Kochanski or with another physician's assistant. The only physician directly involved with her care (except for emergency room doctors) is the neurologist, Dr. Kuruvilla.

[6] Dr. Kuruvilla's notes indicate that Plaintiff declined to have the MRI performed at Rhode Island Hospital because she preferred an "open" MRI due to fear of enclosed space. Tr. 268. There is no evidence in the record that she made any attempt to get an MRI until she returned to Dr. Kuruvilla in December 2010.

2010 encounters. Tr. 258. At Rhode Island Hospital, the record reflects that she "[d]enies blurred vision, dizziness, headaches, in entire." Tr. 254

Despite the lack of a diagnosis of either a stroke or IIH, on October 15, 2010, Plaintiff filed her claim for Social Security benefits; in her disability report prepared in January 2011, she claimed, "I had a stroke on June 30, 2010, while at work." Tr. 205. Nevertheless, when she next saw Mr. Kochanski on December 21, 2010, she reported that she was not working because her employer had no light duty work for her and that she was still waiting to hear the results of the tests Dr. Kuruvilla had recommended. Tr. 257. Because she reported that she was "still getting headaches, has some memory problems, and has at times trouble concentrating," Mr. Kochanski urged her to return to the neurology clinic and demand an appointment. Tr. 258. There is no description of the severity of the headaches and no suggestion that they are so debilitating as to prevent her from functioning.

On December 30, 2010, she met again with Dr. Kuruvilla. Tr. 265-66. This time, she reported intense headaches that had begun at the end of August 2010 and lasted for up to one and a half days and occurred once or twice per week. Tr. 265. Dr. Kuruvilla identified a range of differential diagnoses, including occipital neuralgia, migraine headache and benign intracranial hypertension (IIH) and urged her to get the testing done as soon as possible. Tr. 266. Plaintiff returned to the neurologist on January 27, 2011; at that appointment, Dr. Kuruvilla noted that the neurologic examination and the MRIs of the brain and cervical spine were all normal. Tr. 276. Dr. Kuruvilla diagnosed Plaintiff's episodes as consistent with migraine and prescribed amitriptyline to be taken prophylactically for migraine and Motrin with a cup of coffee if she felt a headache coming on. Id. Plaintiff was advised to follow-up in three months. Id.

Plaintiff's next relevant treatment was six months later, on June 24, 2011, when she returned to Mr. Kochanski for recheck of her blood pressure. Tr. 285-86. The record from the appointment reflects that she was taking medication for hypertension, had been checking her blood pressure "daily at home and says it had been ok," but that Elavil, which she was taking for headaches, was not working. Id. During this appointment, Plaintiff told Mr. Kochanski that she "left her neurologist because she wasn't listening to her c/o and comments about the med not helping." Tr. 285. Plaintiff also reported that she was applying for disability; "when that goes through and she has insurance again she will find another neurologist." Id. There is no reference in Mr. Kochanski's notes from this encounter to debilitating headaches; his physical examination note states, "no acute distress." Tr. 286.

Six months later, on January 9, 2012, Plaintiff again saw Mr. Kochanski. Tr. 293-94. In addition to asking him to complete forms in connection with her pending Social Security application, this time, she told him she was getting severe headaches that were totally incapacitating her three times a week; he incorporated her statement into his findings on the Social Security forms. Tr. 293, 296-300. Mr. Kochanski performed physical and mental status examinations – all findings were normal. Tr. 294. Despite no confirming medical test results or diagnosis by any qualified medical provider, Mr. Kochanski assessed benign intracranial hypertension (IIH); he advised her to return to see either him or Dr. Ellison about it when she had insurance. Id. Plaintiff returned to see Mr. Kochanski in February 2012 complaining of pain in her right knee that she attributed to the exercises she had been doing on the hydraulic resistance machines she had been using at the gym. She made no complaint about headaches and her depression screen was scored in the negative range. Tr. 292-93.

On August 16, 2012, shortly before the hearing on her Social Security application, Plaintiff visited the emergency room of Kent Hospital complaining of right arm numbness, dizziness and vertigo; she was admitted for overnight observation. Tr. 311-40. By the following morning, she had a mild headache and nausea but no other symptoms; by the time she was discharged later in the day, she reported that "she has no other complaints." Tr. 319. The Kent Hospital physician diagnosed "atypical migraine with headache, right-sided weakness and numbness resolved," advised not to drive a car until approved by her doctor, and prescribed daily aspirin with a trial of Topamax for migraine prevention. Tr. 321-22, 333. Based on Plaintiff's inaccurate report, the discharge summary states that she had been "recently diagnosed with pseudotumor cerebri [IIH] from a MRI of the brain." Tr. 319.

On August 27, 2012, Plaintiff underwent a noninvasive cerebrovascular ultrasound to assess intracranial hypertension (IIH) and rule out carotid stenosis. Tr. 339. The interpreting physician recorded his finding that the examination was "essentially normal." Tr. 340.

### B.      Opinion Evidence

Six months after Plaintiff applied for DIB, at the request of Disability Determination Services ("state agency") for the State of Rhode Island, on May 2, 2011, Dr. Henry Laurelli prepared an RFC opinion based on his file review. He concluded that Plaintiff could lift no more than twenty pounds occasionally, could stand or walk for up to four hours and could sit for up to six hours; he included postural and environmental limitations particularly based on dizziness. Tr. 79-80. His opinion noted that, while pseudo-tumor cerebri (IIH) and stroke were mentioned as potential differential diagnoses, neither had ever been established as her diagnosis and that her clinical neurological symptoms were all normal. Tr. 80. He considered her headaches and obesity in his opinion. Id.

Next, on May 18, 2011, state agency psychologist Dr. Jorge Armesto performed a clinical interview and testing of Plaintiff and prepared a psychological evaluation. Tr. 277-82. During the interview, Plaintiff told him that she had pseudo tumor cerebri (IIH) and had a mini-stroke on June 30, 2010; since then, she claimed that her concentration, attention span and memory had decreased. Tr. 277-78. She also reported an array of other psychological symptoms, including anhedonia, avolition, insomnia, changes in appetite, feelings of worthlessness and thoughts of death and dying. Tr. 281. On examination, Dr. Armesto determined that her "[a]ttention and concentration were grossly intact" and she had no difficulty with memory; overall, he noted that objective testing placed her mostly in the average range. Id. Assigning a GAF[7] of 50, Dr. Armesto noted diagnoses of major depressive disorder, cognitive disorder, pseudotumor cerebri (IIH), asthma and obesity. Nevertheless, because she was taking no psychiatric medication, had no psychiatric admissions and treatment except for brief counseling at the death of her grandfather, had supportive family and friends and an intact mental status examination, he concluded that the majority of her difficulties appeared to be physical or neurological, not psychological. Tr. 278, 280-81. On June 8, 2011, state agency psychologist Dr. Clifford Gordon opined that Plaintiff's mental RFC was moderately limited by her ability to remember and carry out detailed instructions and that she has moderate limitations of concentration, persistence, pace

---

[7] GAF refers to a Global Assessment of Functioning ("GAF") score. The GAF scores relevant to this case are in the 41 – 50 range, which indicates "serious impairment in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–V")). In response, the Social Security Administration ("SSA") released an Administrative Message (AM–13066, July 22, 2013) ("SSA Admin Message") to guide "State and Federal adjudicators . . . on how to consider . . . GAF ratings when assessing disability claims involving mental disorders." It makes clear that adjudicators may continue to receive and consider GAF scores. See SSA Admin Message at 2-6.

and adaptation.  Tr. 81-82.  Two days later, on June 10, 2011, her Social Security application was denied initially.  Tr. 84.

After she applied for reconsideration, more state agency opinion evidence was procured. On July 14, 2011, psychologist Dr. Michael Slavit reviewed the record and opined that Plaintiff has mild restriction of activities of daily living, no difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Tr. 92.  On September 29, 2011, physician Dr. Youssef Georgy reviewed the record and provided an RFC opinion concluding that Plaintiff could stand and/or walk for four hours, could sit for six hours, could occasionally lift up to twenty pounds, and could occasionally balance, kneel, crouch, crawl and climb ramps and stairs, but needed to avoid even moderate exposure to heights or hazards due to dizziness and unsteadiness.  Tr. 93-95.  Echoing Dr. Laurelli's conclusions, Dr. Georgy noted that pseudotumor cerebri (IIH) and stroke had been mentioned as differential diagnoses but had not been established; his opinion took Plaintiff's headaches into account.  Tr. 95.

After reconsideration was denied on October 3, 2011, Plaintiff submitted her own opinion evidence.  Specifically, on January 9, 2012, Mr. Kochanski, the physician's assistant who had handled most of her primary care appointments, completed an RFC questionnaire.  Tr. 296-300. Relying solely on what she had told him, he wrote that her diagnosis is "idiopathic intracranial hypertension" (IIH), and that the test confirming that diagnosis is "abnormal MRI."  Tr. 296. Otherwise, Mr. Kochanski indicated that her hypertension is controlled with medication, that emotional factors did not contribute to the severity of her symptoms and limitations, that she did not have chronic pain or paresthesia and that her headache pain was not associated with an impairment of the cervical spine.  Tr. 296-97.  Despite his opinion that medication controlled her high blood pressure, Mr. Kochanski opined that Plaintiff had debilitating headaches "due to

hypertension" three times per week lasting ten or more hours.  Tr. 297-98.  With no suggestion that he was basing his conclusions on any clinical tests or observations, Mr. Kochanski concluded that Plaintiff's pain and other symptoms would interfere with her ability to maintain the attention and concentration needed to perform simple tasks for between 34% and 66% of an eight-hour workday and that she would miss more than four days of work per month.  Tr. 296-300.  Despite the lack of any record reference suggesting that he had ever seen her, Dr. Ellison co-signed Mr. Kochanski's opinion.  Tr. 300.

Plaintiff also procured an opinion from psychologist Dr. John Parsons.  He performed a one-time psychological evaluation of Plaintiff at the request of her attorney on August 30, 2012.  Tr. 303.  Plaintiff told him that she had been hospitalized in 2010 for a TIA and that she had been diagnosed with intracranial hypertension (IIH).  Tr. 305.  He did a clinical interview, a mental status examination and an array of tests, resulting in diagnostic impressions of mood disorder (not otherwise specified), generalized anxiety disorder and rule-out breathing-related sleep disorder.  Tr. 309.  Dr. Parsons assigned a GAF score of 42 and opined that, due to the severity of her emotional problems, somatic concerns, and chronic pain, she could not maintain gainful employment.  Tr. 309-10.  He based this opinion on the conclusion that she has limited energy and drive and difficulty attending, concentrating and focusing, which would leave her incapable of responding effectively to the typical pressures in a work setting.  Tr. 310.  He accompanied his evaluation with an RFC opining to moderately severe limitations on Plaintiff's ability to relate to other people, to function socially, to understand, remember and carry out complex instructions, and to respond to customary work pressure.  Tr. 301-02.

## II.    Travel of the Case

Plaintiff protectively filed a DIB application on October 14, 2010,[8] alleging disability as of June 30, 2010.  Tr. 85, 153.  Her application was denied initially and on reconsideration.  Tr. 74-99.  On October 1, 2012, the ALJ issued his decision finding that Plaintiff was not disabled at any relevant time.  Tr. 13-31.  The Appeals Council denied review on October 18, 2013, making the ALJ's decision final.  Tr. 1-3.  Plaintiff timely filed this action.

## III.    The ALJ's Hearing and Decision

On September 18, 2011, the ALJ held a hearing at which Plaintiff, represented by counsel, appeared and testified, as did Plaintiff's mother and a vocational expert.  Tr. 35-73. Plaintiff testified that she could sit, stand and walk for approximately four to six hours each, and did not have problems doing much of anything unless she has a headache.  Tr. 42-45.  When her head hurts, she said that she is "very limited on anything," including memory, concentration and focus and getting along with coworkers and supervisors.  Tr. 42-46.  Plaintiff testified that she stopped seeing her neurologist because she did not listen and had prescribed amitriptyline, which had made Plaintiff depressed.  Tr. 56-57.  Plaintiff claimed she could not see another doctor until she paid at least $5,000 on her bill, which she could not afford.  Tr. 57.  Her mother testified that Plaintiff used to love to work but now she stays "in bed constantly" and "when she talks it doesn't make sense."  Tr. 58-59.

A vocational expert testified that, if Plaintiff's testimony were accepted as credible, there would be no work available for her.  Tr. 62.  The ALJ then asked the vocational expert to consider someone of Plaintiff's age, education and work experience who had the following limitations: ability to lift and carry twenty pounds occasionally and ten pounds frequently; sit six

---

[8] Although Plaintiff's application was filed on January 13, 2011, she received a protective filing date of October 14, 2010.  Tr. 85, 151; see 20 C.F.R. §§ 404.614, 404.630, 404.632.

hours out of an eight-hour workday; stand and walk four hours out of an eight-hour workday; stand and walk four hours out of an eight-hour workday; inability to climb ladders, ropes or scaffolding; occasionally balance, stoop, kneel, crouch or crawl; no excessive exposure to fumes, odors, dusts, gases or poor ventilation; no work at unprotected heights or around dangerous moving machinery; limited to simple, routine, competitive, repetitive, non-abstract tasks on a sustained basis over a normal eight-hour workday in a stable work environment; no significant interactions with the public; and no requirements to perform complex or detailed tasks. Tr. 62-63. The vocational expert testified that an individual with these limitations would be able to work in such unskilled, sedentary and light positions as assembler, inspector, production worker and machine tender, all of which are available in the Rhode Island and Southeastern Massachusetts region, and that there would be substantially more positions in the national economy. Tr. 63-64.

In his decision, at Step One in the familiar five-step sequential evaluation, the ALJ found that Plaintiff meets the insured status requirement of the Act through December 31, 2015, and has not engaged in substantial gainful activity since June 30, 2010, the alleged onset date. Tr. 18. At Step Two, the ALJ found that Plaintiff had severe impairments of migraines, a pseudotumor cerebri (IIH), a mood disorder, a generalized anxiety disorder, obesity and a cognitive disorder. Tr. 18-19. At Step Three, he concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526. Tr. 19-21. In support of this finding, the ALJ determined that Plaintiff had mild limitations in activities of daily living and social functioning and moderate limitations in concentration, persistence or pace, while she had had no episodes of decompensation. Tr. 20.

At Step Four, the ALJ determined that Plaintiff had the RFC to perform light work, with additional limitations consistent with the hypothetical he had posed to the vocational expert. Tr. 21. In formulating his RFC finding, the ALJ found that, while Plaintiff did seem to have headaches, her testimony and statements in describing their extent and intensity lacked credibility; he grounded this adverse credibility finding in a detailed examination of her inconsistent reports to medical providers and opinion sources, which he laid out in the decision. Tr. 26-28. He also discounted her mother's credibility, particularly regarding her testimony that Plaintiff stays in bed all day. Tr. 27. Based on the RFC, the ALJ found that Plaintiff could not perform her past relevant work as a certified nurse's aide or as a customer service representative. Tr. 30. At Step Five, in reliance on the vocational expert's testimony, the ALJ found there are jobs that exist in significant numbers in the local and national economies that the Plaintiff can perform. Tr. 30-31. Accordingly, the ALJ concluded that Plaintiff had not been disabled from June 30, 2010, through October 1, 2012, the date of his decision. Tr. 31.

## IV.    Issues Presented

Plaintiff's motion for reversal rests on her arguments that the ALJ failed properly to evaluate the opinion evidence and that substantial evidence does not support the ALJ's adverse credibility findings regarding Plaintiff's testimony and that of her mother. Relatedly, she contends that it was error for the ALJ not to employ a medical expert to develop the record.

## V.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991). Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001). On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)). The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. Id.

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(I); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is

unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[9] is not an "acceptable medical source." 20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically

---

[9] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p, 2006 WL 2263437, at *1.

determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. § 404.1545-1546, or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

**B.      Developing the Record**

Social Security proceedings are "inquisitorial rather than adversarial." Sims v. Apfel, 530 U.S. 103, 110-11 (2000); Miranda v. Sec'y of Health, Educ. & Welfare, 514 F.2d 996, 998 (1st Cir. 1975) (Social Security proceedings "are not strictly adversarial"). The ALJ and the Appeals Council each have the duty to investigate the facts and develop the arguments both for and against granting benefits. Sims, 530 U.S. at 110-11. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. Evangelista, 826 F.2d at 142. Courts in this Circuit have

made few bones about the responsibility that the Commissioner bears for adequate development of the record.  Id.; see Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 80-81 (1st Cir. 1982); Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C.    The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. § 416(i)(3).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### D.    Making Credibility Determinations

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## VII.    Application and Analysis

### A.    Opinion Evidence

#### 1.    Kochanski Opinion

Plaintiff leads with her attack on the ALJ's determination to afford "limited weight" to the opinion of Mr. Kochanski, which was co-signed by Dr. Ellison, while giving "considerable

weight" to those of state agency psychologist Dr. Slavit and state agency physician Dr. Georgy. Because there is substantial evidence supporting this decision, I find no error in the ALJ's resolution of these matters.  See Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 12 (1st Cir. 1982) ("conflict between the personal physician and the medical advisor was for the [Commissioner] to resolve"); Rodriguez, 647 F.2d at 222 (1st Cir. 1981) ("[I]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [ALJ].").

First, the ALJ was spot-on in his conclusion that the Kochanski opinion does not qualify for deference as a treating source opinion because Mr. Kochanski, the medical provider with whom Plaintiff had most of her appointments, is a physician's assistant and not an "acceptable medical source."  20 C.F.R. § 404.1513(a); SSR 06-03p, 2006 WL 2263437, at *5 ("other source" not entitled to same deference as treating physician).  It is well-settled that neither the physician's sign-off on each encounter that the patient had with the physician's assistant nor the physician's sign-off on the physician assistant's opinion morphs the assistant into an acceptable medical source.  See Lobov v. Colvin, No. 12-40168-TSH, 2014 WL 3386567, at *14 n.8 (D. Mass. June 23, 2014) (co-signature of acceptable medical source on opinion of "other source" "had no bearing on the ALJ's discretion to assign weight" to other source opinion); Coppola v. Colvin, No. 12-cv-492-JL, 2014 WL 677138, at *9 (D.N.H. Feb. 21, 2014) (signature of acceptable medical source on opinion completed by non-acceptable medical source did not establish it as "treating source" opinion where evidence did not establish that doctor had ongoing treatment relationship); Payne v. Astrue, No. 3:10-cv-1565, 2011 WL 2471288, at *4-5 (D. Conn. June 21, 2011) (physician's assistant opinion co-signed by acceptable medical source not "treating physician opinion" where no evidence that acceptable medical source "was ever

directly involved in the assessment or treatment of [claimant]").  Plaintiff's record is devoid of any evidence that she had a direct treating relationship with Dr. Ellison; not a single medical record reflects that he was the medical provider who saw her.  See Hobart v. Astrue, No. 11-151, 2012 WL 832883, at *7-8 (D.N.H. Feb. 9, 2012) ("focus must be limited to the treatment provided by the source who gave the opinion . . . treatment others provided is not a part of [the acceptable medical source's] treatment relationship with [the claimant]").

Nevertheless, it is also clear that the opinion of a physician's assistant is important and should be considered in evaluating the severity and functional effects of an impairment.  SSR 06-03p, 2006 WL 2263437, at *2-3 (source such as physician's assistant may provide insight into severity of impairment and impact on ability to function).  Consistent with this guidance, and accepting that Plaintiff suffers from headaches, the ALJ carefully considered the functional limits to which Mr. Kochanski opined.  An examination of the Kochanski opinion in the context of the record reveals that there is no error tainting the ALJ's decision to afford it limited weight.

The ALJ's substantive analysis of the Kochanski opinion began with its erroneous foundational diagnosis and supporting clinical findings – IIH based on an "abnormal MRI." There is no record evidence reflecting either a diagnosis of IIH or an abnormal MRI; while Dr. Kuruvilla considered IIH as a differential diagnosis, the subsequent MRI was normal and the diagnosis was not made.  The other record references to IIH are all derived from Plaintiff's erroneous report to subsequent providers that it had been diagnosed.  See Tr. 277, 319.  Mr. Kochanski's opinion is grounded in the same error – Plaintiff's misunderstanding of what she was told by the Rhode Island hospital neurologist.  Lill v. Astrue, 812 F. Supp. 2d 95, 105 (D. Mass. 2011) ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent'

on a claimant's self-reports that have been properly discounted") (quoting <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008)).

Second, the ALJ properly found the Kochanski opinion internally inconsistent: it first notes that Plaintiff's blood pressure is controlled with medication, a conclusion well supported by the medical record, but then it opines that her "headache is due to hypertension." Tr. 297. The ALJ raised this inconsistency at the hearing, and Plaintiff's attorney responded enigmatically, "they're still trying to figure it out . . . Dr. Ellison is doing the best he can." Tr. 47. Now Plaintiff hyperbolically accuses the ALJ of missing entirely that IIH can cause headaches as a result of spinal fluid pressure in the brain; she attaches material from four different websites to be sure this Court does not make the same mistake.[10] The problem, of course, is that no qualified medical provider has ever diagnosed IIH. Nor is there any suggestion in his opinion that, when Mr. Kochanski used the term "hypertension," which means "high blood pressure,"[11] he was referring to spinal fluid pressure.[12] The ALJ is right – Mr. Kochanski's opinion does not make sense.

---

[10] For the same reason, Plaintiff contends that the ALJ erred in failing to call a medical expert to clear up the confusion about IIH. This argument is unavailing. The problem was not that the ALJ was making a medical judgment about confusing evidence that is outside his ken as a layperson; rather, the problem is that Dr. Kuruvilla, the neurologist who is qualified to diagnose and treat IIH, concluded that Plaintiff has treatable migraines. The confusion is that created by Plaintiff's insistence that she is disabled based on a diagnosis that was never established.

[11] Hypertension means high blood pressure. <u>See</u> <u>Whaley v. Colvin</u>, No. 1:13CV2684, 2014 WL 3871130, at *4 n.4 (N.D. Ohio Aug. 7, 2014); <u>Seider v. Astrue</u>, No. 1:11-CV-153, 2012 WL 641942, at *3 (S.D. Ohio Feb. 28, 2012) (citing <u>Stedman's Medical Dictionary</u> 855 (27th ed. 2000)).

[12] Mr. Kochanski's contemporaneous treatment note attributes the "severe debilitating headaches" not to hypertension, but to "her [IIH]." Tr. 293. If this is what he intended to write in his RFC opinion, it would cure the inconsistency identified by the ALJ, but would leave Plaintiff with an opinion based on a condition that was never diagnosed.

The third, and perhaps most serious, defect in the Kochanski opinion is that the functional limitations it lists seem to be based on Plaintiff's subjective complaints that day[13] and not on any clinical tests, observations or medical findings that Mr. Kochanski made or was qualified to make. For example, Mr. Kochanski opines that the headaches cause debilitating inability to concentrate, mental confusion and mood changes, yet he performed no testing, lacks the credentials to make these observations and had no other qualified source on which to rely. At best, Mr. Kochnaski's opinion simply records Plaintiff's subjective description of her headaches and their impact on her. Further, it is a description of incapacitating headaches that is largely inconsistent with the description of her headaches (or lack of headaches) in her other treating records. See n.13, *supra*. The ALJ committed no error in affording it limited weight. Jette v. Astrue, No. 07-437A, 2008 WL 4568100, at *16 (D.R.I. Oct. 14, 2008) (opinion based upon subjective complaints that ALJ does not find credible appropriately rejected).

        2.      Parsons Opinion

Plaintiff's next assault focuses on the ALJ's treatment of the examining psychologist, Dr. Parsons, who was engaged by Plaintiff to perform a one-time psychological examination. The ALJ was critical of Dr. Parsons, correctly noting the inconsistency between his conclusion that Plaintiff had debilitating psychological limitations and her complete lack of any psychiatric or psychological treatment, coupled with the opinion of her only consistent treating provider, Mr. Kochanski, that no psychological conditions affect her. Tr. 29, 296. Ultimately, the ALJ

---

[13] The Kochanski opinion was completed on January 9, 2012, the same date as an appointment with him during which he wrote that Plaintiff "[s]ays she gets the severe headaches about 3 times a week and is totally incapacitated when she gets them. She is here with forms to be completed." Tr. 293. By contrast at Plaintiff's next appointment with Mr. Kochanski on February 28, 2012, she made no mention of any headaches, and focused instead on knee pain related to working out on exercise machines at the gym. Tr. 292. The only other time Plaintiff complained that her headaches were serious was at her December 2010 appointment with Dr. Kuruvilla, who ultimately diagnosed migraine and prescribed amitriptyline and Motrin with coffee. Tr. 265, 276. Otherwise, most of Plaintiff's treating records either omit or deny headaches in describing symptoms, Tr. 254, 267-68, and when she did mention a headache, she described it as "mild" or "dull." Tr. 258, 319.

rejected Dr. Parsons's opinion outright. Tr. 30. Plaintiff contends that Dr. Parsons's rejected evaluation is indistinguishable from that of Dr. Armesto, the state agency psychological examiner, yet the ALJ did not entirely reject the latter's work.[14]

Plaintiff argues that the ALJ's acerbic critique of the form[15] Plaintiff's counsel developed for Dr. Parsons amounted to a display of hostility to the substance of Dr. Parsons's opinion. This is not accurate. The contretemps was caused by the form and was not related either to Dr. Parsons or his opinion – it arose because the form listed definitions for the ratings (mild, moderate, moderately severe, severe) added by the attorney that the ALJ concluded differ from the meaning assigned to those ratings by the Commissioner. This could lead to confusion whether the opining source is rating based on the familiar system or is using the different method incorporated into the form. Whether or not the ALJ's sharp criticism of this practice is well-founded, it did not affect his consideration of the substance of Dr. Parsons's opinion. As Plaintiff noted, Dr. Parsons regularly performs consultative examinations on behalf of the Commissioner and is well respected in the community. ECF No. 8-1 at 12. He is undoubtedly familiar with the meanings ascribed to the rating system laid out in the regulations. In any event, there was no confusion affecting Plaintiff's case because, as Plaintiff made clear in her supplemental filing, Dr. Parsons subsequently filled in a form without the definitions that the ALJ found troubling and assigned the same ratings. Tr. 238-41.

---

[14] Although he did not reject Dr. Armesto's report, the ALJ gave no significant independent weight to the conclusion in it that Plaintiff's ability to respond to customary work pressures was decreased because he found the statement vague. Tr. 29. He also gave limited weight to Dr. Armesto's GAF score of 50, finding it inconsistent with Dr. Armesto's other observations and the rest of the record (except Dr. Parsons's opinion). Tr. 28. In any event, the ALJ noted that Dr. Armesto's conclusions and observations were incorporated into the RFC analysis prepared by state agency psychologist Dr. Slavit, to which the ALJ afforded considerable weight. Tr. 29, 91.

[15] The ALJ called it an "inconsistent, contradictory nonsensical attorney prepared form, which changes the commonly utilized definitions of impairment severity to make moderate limitations causing inability to perform a work-related function up to 25% of the time." Tr. 25.

Plaintiff also contends that it was unfair for the ALJ to label Dr. Parsons's report as an "advocacy opinion" simply because it is a one-time examination obtained in connection with a pending claim for disability, while not using the same label for the one-time examination report prepared by Dr. Armesto. These labels amount to a difference without distinction: the ALJ carefully considered each opinion separately, properly taking into account the circumstances with respect to the preparation of each. See Machado v. Astrue, C.A. No. 09-045A, 2009 WL 3837226, at *9-10 (D.R.I. Nov. 13, 2009). In his review of the Parsons opinion, the ALJ provided reasons well-grounded in the record for his decision to reject it.

The ALJ's analysis of Dr. Parsons's opinion began with his appropriate rejection of the conclusion that "Ms. Allen is unable to maintain gainful employment" because it is a matter reserved to the Commissioner. Tr. 29, 310; 20 C.F.R. § 404.1527(d). The ALJ also focused on the inconsistency of the opinion with other record evidence, all of which supports the absence of serious mental health concerns, including Plaintiff's testimony that she does not "have problems doing much of anything," except when she is having a headache. Tr. 44-45. Similarly, the ALJ noted that Dr. Parsons's one-time examination resulted in observations of impaired gross motor skills, impaired gait, slow/retarded movements and difficulty getting out of chairs, yet the treating neurologist, Dr. Kuruvilla, made normal neurologic findings. Tr. 265-66, 275-76. The ALJ also relied on the inconsistency of Plaintiff's reported symptoms to Dr. Parsons, which were more severe than those she mentioned to others; for example, Plaintiff denied hypomanic episodes during her interview with Dr. Armesto, but told Dr. Parsons that she had such episodes five or six days per week. Tr. 280, 307. Finally, Plaintiff's attempt to buttress Dr. Parsons by arguing that his opinion is essentially the same as that of Dr. Armesto does not work. Apart from

somewhat similar GAF scores,[16] they actually are materially different in that Dr. Armesto's testing exposed no abnormalities and his clinical interview resulted in the conclusion that her "reported difficulties appear to be physical and/or neurological in nature rather than psychological." Tr. 281.

I find no error in the ALJ's rejection of Dr. Parsons's evaluation report and RFC opinion.

### 3. State Agency Opinions

Plaintiff contends that the ALJ "exceed[ed] the logical limit of his discretion" in relying on the file review-based opinions of Dr. Georgy, the state agency physician, and Dr. Slavit, the state agency psychologist, to formulate his RFC. Her argument rests, first, on the impropriety of affording greatest weight to the state reviewing physician/psychologist. Second, she argues that these opinions are not based on substantial evidence because they were rendered almost a year or more[17] before the hearing and did not consider either the subsequent treatment Plaintiff received or the conclusions in the two opinions she subsequently submitted, from Mr. Kochanski and Dr. Parsons. Neither argument is availing – I find that the ALJ's decision to afford considerable weight to the opinions of Dr. Georgy and Dr. Slavit is legally permissible and well-grounded in substantial evidence.

To begin with, there is nothing *per se* erroneous about giving greater weight to reports of medical experts engaged by the Commissioner. Keating, 848 F.2d at 275 n.1 (citing Lizotte, 654 F.2d at 130). The expert opinion of a non-examining source like Dr. Georgy or Dr. Slavit may

---

[16] Dr. Parsons assigned a GAF of 42, while Dr. Armesto assessed a GAF of 50. Tr. 281, 309. The ALJ properly considered and rejected Plaintiff's argument that he should have afforded significant weight to these GAF scores: because they are based on one-time examinations, they are of limited relevance in assessing Plaintiff's ability to work. Bowden v. Astrue, No. CA 11-84 DLM, 2012 WL 1999469, at *9 (D.R.I. June 4, 2012) (ALJ did not err in finding that GAF scores of 20, 25 and 50 did not provide meaningful insight into the claimant's functional abilities, since GAF scores were assigned by non-treating sources); see SSA Admin Message at 2-6 (GAF score assessed by psychiatrist with treating relationship is entitled to greatest weight).

[17] The Georgy opinion was rendered almost a year before the hearing, while the Slavit opinion was prepared fourteen months before.

amount to substantial evidence where it represents a reasonable reading of the entirety of the relevant medical evidence.  See 20 C.F.R. § 404.1527(e); Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991).  In any event, the ALJ's reliance on Drs. Georgy and Slavit is particularly appropriate here, in a case where Plaintiff has not presented an RFC opinion from a treating physician or mental health provider, relying instead on opinions from a treating physician's assistant and a non-treating psychologist.  See SSR 06-03p, 2006 WL 2329939, at *4 (ALJ may consider a number of factors in weighing opinions from sources that are not acceptable medical sources).

More importantly, Dr. Georgy's opinion is consistent with and well supported by the record evidence, particularly the notes of treating neurologist Dr. Kuruvilla, who recorded normal neurological findings, diagnosed the headaches as migraine NOS and prescribed amitiptilyne, with Motrin and coffee when the headache begins.  Tr. 275-76.  The limited treatment Plaintiff received after Dr. Georgy's opinion[18] is consistent with the prior treatment and does not represent any sustained or material worsening in Plaintiff's condition.  Anderson v. Astrue, No. 1:11-CV-476-DBH, 2012 WL 5256294, at *3-4 (D. Me. Sept. 27, 2012) (no error to rely on nonexamining opinion based on part of record when ALJ reviewed full record and reasonably concluded claimant's status had not materially changed); see also Abubakar v. Astrue, No. 11-10456, 2012 WL 957623, at *11-13 (D. Mass. Mar. 21, 2012) (citing Ferland v. Astrue, No. 11-123, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011)).  Similarly, Dr. Slavit relied principally on the Armesto examination report; since Plaintiff had no mental health treatment, before or after, his opinion is well supported by the complete treating record.  Of

---

[18] The post-Georgy treatment consists of two appointments with Mr. Kochanski, one when she asked him to complete her forms and one when she reported knee pain but no headaches.  Also after the Georgy opinion was her overnight stay at Kent Hospital for dizziness, when she reported a mild headache and was diagnosed with migraine.  Otherwise, there is no treatment.

course, neither Dr. Georgy nor Dr. Slavit saw the Kochanski opinion or Dr. Parsons's report.

Because the ALJ found them to be inconsistent with the rest of the record and not entitled to

significant weight, it was not error to rely on an agency opinion that did not consider them.

Charbonneau v. Astrue, No. 2:11-CV-9, 2012 WL 287561, at *7 (D. Vt. Jan. 31, 2012) (not error

to rely on state agency opinion when later-received evidence does not demonstrate change in

claimant's status).  To hold otherwise would be to require the Commissioner always to have the

last word, that is, always to procure an opinion that takes the newest opinion submitted by the

claimant into account.  See Quimby v. Astrue, No. 12-CV-428-PB, 2013 WL 5969600, at *8-9

(D.N.H. Nov. 8, 2013).

I find that the ALJ's reliance on the opinions of Dr. Georgy and Dr. Slavit is well

supported by substantial evidence.

### B. Credibility Findings

With no diagnosed impairment except migraine headaches, and no clinical evidence to

establish them as disabling in severity, Plaintiff's claim rises and falls on the credibility of her

subjective complaints.  Not surprisingly, she contends that the ALJ erred in making an adverse

assessment of her credibility, arguing that her complaints about the headaches are "similar . . .

albeit not identical" throughout the record.  The argument overlooks the role of the reviewing

court – as long as the ALJ has articulated specific and adequate reasons for his decision not to

credit a claimant's testimony, this Court will not disturb his findings.  Frustaglia, 829 F.2d at

195.  Here, the ALJ carefully enumerated multiple inconsistencies among Plaintiff's various

subjective reports, highlighting the shifting nature of her complaints.  Tr. 26-27.  For example, he

noted that Plaintiff's report of knee pain because she had been going to a gym to use exercise

machines is profoundly inconsistent with her testimony about the pervasive and debilitating

nature of the headaches. This analysis is more than sufficient to permit the ALJ to draw the credibility conclusion he made. See SSR 96-7p, 1996 WL 374186, at *5 (stating that consistency is one of the key factors in assessing credibility).

Plaintiff makes a secondary attack on the ALJ's credibility assessment, arguing that he relied on the lack of treatment but did not consider her lack of insurance or her "many" emergency room visits for treatment of headaches. This argument is not well founded. The ALJ did consider Plaintiff's lack of insurance and his decision does not reflect an adverse credibility finding based on her failure to get treatment. Tr. 26. And there are no emergency room visits for severe headaches – during the relevant period, Plaintiff went to hospital emergency rooms for (1) paresthesia, when she denied headaches, (2) back strain, with no reference to headaches, and (3) right arm numbness, dizziness and vertigo, when she mentioned only a mild headache the next morning.

Equally well supported is the ALJ's determination that Plaintiff's mother lacked credibility when she testified that her daughter stays in bed all day. The ALJ highlighted the inconsistency between this claim and the record evidence, including her statements that she socializes with family and friends and goes shopping and to church, among other activities. See, e.g., Tr. 217, 219, 278. He also noted the inconsistency between Plaintiff's claim of debilitating depression and her mother's testimony that Plaintiff was not depressed while she was working. I find that the ALJ properly considered and rejected the mother's testimony. 20 C.F.R. § 404.1513(d) (testimony "from spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers" may also be considered); see SSR 06-03p, 2006 WL 2263437, at *2-3 (information from "other sources" may be based on special knowledge of the individual and may provide insight into the severity of impairments).

The ALJ's credibility determinations are well supported by the evidence in the record; this Court should not disturb them.

**VIII.   <u>Conclusion</u>**

I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 8) be DENIED and the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 12) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 30, 2015